IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

AMERICAN RIVERS, INC., IDAHO                          CV-04-0061-RE
RIVERS UNITED, NATIONAL WILDLIFE
FEDERATION, PACIFIC COAST                          OPINION AND ORDER
FEDERATION OF FISHERMEN'S
ASSOCIATIONS, and INSTITUTE
FOR FISHERIES RESOURCES,

            Plaintiffs,

    vs.

NOAA FISHERIES, and UNITED STATES
BUREAU OF RECLAMATION,

            Defendants,

        and

DIRK KEMPTHORNE, Governor of the State
of Idaho, STATE OF IDAHO, IDAHO WATER
USERS ASSOCIATION, COALITION FOR

1   -   OPINION AND ORDER

IDAHO WATER, INC., PIONEER IRRIGATION
DISTRICT, SETTLERS IRRIGATION
DISTRICT, NAMPA and MERIDIAN IRRIGATION
DISTRICT, GEM IRRIGATION DISTRICT,
RIDGEVIEW IRRIGATION DISTRICT, OWHYHEE
IRRIGATION DISTRICT, VALE IRRIGATION
DISTRICT, LOWER POWDER RIVER
IRRIGATION DISTRICT, and BURNT RIVER
IRRIGATION DISTRICT,

      Defendant-Intervenors.


REDDEN, Judge:

   The matters before the court are the motion for partial summary judgment of

plaintiffs American Rivers  (doc. 177); the motion for summary judgment of defendant-

intervenor State of Idaho  (doc. 199); the motion for summary judgment of defendant-

intervenors Water Users (doc. 208); the cross-motion for partial summary judgment of

federal defendants NOAA Fisheries and Bureau of Reclamation (doc. 214); and Water

Users' motions to strike plaintiffs' declarations, (doc. 203, doc. 251), immaterial and

impertinent allegations (doc. 205), and reply memorandum/additional extra-record

materials (doc. 249).

   For the following reasons, the court **GRANTS in part** and **denies in part**

plaintiffs' motion for partial summary judgment, **GRANTS in part** and **DENIES in part**

motion for summary judgment of defendant-intervenor State of Idaho, **GRANTS in part**

and **DENIES in part** the cross-motion for summary judgment of federal defendants,

and **DENIES** the motions to strike and motion for summary judgment of defendant-

intervenors Water Users.

2 - OPINION AND ORDER

## BACKGROUND

The Snake River–the Columbia River's largest tributary–rises just above Jackson Lake in Wyoming, and winds circuitously through central Idaho and into southeast Washington, eventually flowing into the Columbia River, just north of the Oregon-Washington border.  Historically, millions of adult salmon and steelhead once spawned throughout the Snake River Basin–as far as 462 miles inland.  Salmon and steelhead abundance in the Snake River has declined precipitously throughout the last century, however, primarily as a result of over-fishing and water project development throughout the Columbia and Snake River Basins.  Indeed, the completion of the Hells Canyon dams near the Oregon-Idaho border in the late 1950s permanently blocked access to all upper Snake River spawning grounds.  And despite the listing of several Snake River salmon species as threatened or endangered under the Endangered Species Act (ESA) in the 1990s, returning adult salmon populations in the lower Snake River now average only several thousand per year.

This opinion addresses the latest in a series of biological opinions issued by the federal government that have ostensibly attempted to stem the decline of threatened and endangered Columbia and Snake River Basin salmon while preserving tribal fishing rights, and protecting the region's economic and political interest in cheap hydropower, agricultural irrigation, and commercial/recreational fishing.

 NOAA Fisheries (NOAA) issued this biological opinion (2005upperSnakeBiOp) to address the effects of the Bureau of Reclamation's (BOR) proposed operation of twelve water projects above Hells Canyon Dam on the thirteen threatened or endangered species of salmon and steelhead that occupy habitat in the Snake and

3    -  OPINION AND ORDER

Columbia Rivers below these dams.[1]   The 2005upperSnakeBiOp followed BOR's

November 2004 Biological Assessment for "Operations and Maintenance in the Snake

River Basin Above Brownlee Reservoir," in which BOR concluded that its proposed

operations in the upper Snake River were likely to adversely affect the four listed Snake

River salmon and steelhead species by indirectly affecting water temperatures and total

dissolved gas concentrations on the Snake and Columbia Rivers.  AR A.1, BiOp at 6-2.

Despite these impacts, the 2005upperSnakeBiOp concluded that BOR's proposed

operation of the upper Snake River projects would not jeopardize the continued

existence of any listed species, or destroy or adversely modify their critical habitats.

The proposed action under the 2005upperSnakeBiOp has two primary

components: (1) the operation and maintenance of eleven projects in the Upper Snake

River Basin;[2] and (2) the "[f]uture provision of salmon flow augmentation from the rental

---

[1]The 2005upperSnakeBiOp considered the effects of BOR's upper Snake River operations on twelve species of salmon or steelhead listed as threatened or endangered, including: (1) Snake River spring/summer chinook salmon; (2) Snake River fall chinook salmon; (3) Upper Columbia River chinook salmon; (4) Upper Willamette River chinook salmon; (5) Lower Columbia River chinook salmon; (6) Snake River steelhead; (7) Upper Columbia River steelhead; (8) Middle Columbia River steelhead; (9) Upper Willamette River steelhead; (10) Lower Columbia River steelhead; (11) Columbia River chum salmon; and (12) Snake River sockeye salmon.  The BiOp also considered the effects of BOR's proposed operations on the Lower Columbia River coho salmon, which were proposed for listing as threatened in June 2004.  Of the thirteen species considered in the 2005upperSnakeBiOp, three species have critical habitat designations.

[2]The 2005upperSnakeBiOp proposed action included consideration of BOR's operation and maintenance of the: (1) projects above the Milner Dam (Michaud Flats, Minidoka, Palisades, and Ririe); (2) the Little Wood River Project;  (3) Owyhee Project; (4) Boise System (Arrowrock and Lucky Peak); (5) Payette River System; (6) Malheur River system (Vale Project); (7) Mann Creek Project; (8) Burnt River Project; (9) upper Powder River system; (10) lower Powder River system; and (11) surveys and studies for Snake River physa below Minidoka.

or acquisition of natural flow rights." AR A.1, BiOp at 1-3.  Although the primary purpose

of each of BOR's upper Snake River water projects is to provide irrigation flows, the

agency operates most of the projects for multiple purposes, including flood control,

limited hydroelectric power generation, recreation, and fish and wildlife conservation.

See Decl. of Pedde, Exh. 1.  Those projects that do generate hydroelectric power–the

Boise, Mindoka, and Palisades Projects–are connected to and contribute power to the

Bonneville Power Administration (BPA), which is authorized to market power generated

by those projects, along with the power generated by the downstream Federal Columbia

River Power System (FCRPS) dams.[3]  Unlike the FCRPS dams, however, the upper

Snake River projects generate power primarily to serve the electricity needs of the BOR

irrigation projects.  Only if the upper Snake River projects generate surplus power is

BPA authorized to sell such surplus power.  Although the 1997 Pacific Northwest

Coordination Agreement directs BPA and BOR to coordinate power generation

operations to the extent consistent with other project purposes, BPA has no authority to

direct BOR to make any particular amount of power available for sale, or to schedule

---

[3]There is no statutory definition of the term Federal Columbia River Power System (FCRPS).  Although BPA generally classifies 31 different projects as making up the FCRPS for accounting, marketing, and repayment purposes, the U.S. Army Corps of Engineers (Corps), Bonneville Power Administration (BPA), and BOR, since 1991, have defined the term FCRPS to include the coordinated operation of 14 sets of multi-purpose dams, powerhouses, and reservoirs, including Dworshak, Lower Granite, Little Goose, Lower Monumental, and Ice Harbor dams in the lower Snake River; Albeni Falls, Hungry Horse, Libby, Grand Coulee, Banks Lake, and Chief Joseph dams in the upper Columbia River; and McNary, John Day, The Dalles, and Bonneville dams in the lower Columbia River.  These projects are operated for purposes of navigation, hydroelectric power generation, irrigation, flood control, recreation, and fish and wildlife conservation.  Grand Coulee and Hungry Horse dams are managed by BOR.  The other 12 projects are managed by the Corps.

the timing of such power generation.

Water use in the upper Snake River–for irrigation and flood control projects–depletes annual flows below the Hells Canyon dams by approximately six million acre-feet (maf).  State and private projects account for 4 million acre feet of the depletion, and BOR water projects account for the remaining 2 million acre-feet.  AR A.1, BiOp at 7-2.

Reduced flows contribute to juvenile salmon mortality in the lower Snake and Columbia Rivers by adversely affecting the quality of occupied salmon habitat downstream, increasing water temperatures, impacting water quality, and disrupting the migration cycle of some species of juvenile salmon.  BOR's operation of the upper Snake River water projects, with the resulting reduction in water flows therefore indirectly contributes to juvenile salmon mortality in the lower Snake and Columbia Rivers.  To reduce juvenile salmon mortality through the FCRPS dams, NOAA has specifically directed BOR to provide 427 thousand acre-feet (kaf) of flow augmentation annually from the upper Snake River to reduce juvenile salmon mortality through the FCRPS dams since the agency issued its 1995 FCRPS BiOp.  Although BOR failed to provide the full 427 kaf from 2001 through 2004, the 2005upperSnakeBiOp directs BOR to provide a slightly more ambitious flow augmentation of 487 kaf annually.  BOR admits, however, that there is only a 50/50 chance that it will be able to provide the full amount of annual water flow augmentation specified in the 2005upperSnakeBiOp, and nothing specifically requires the agency to reach this level.

## PLAINTIFFS' CLAIMS

Plaintiffs allege the 2005upperSnakeBiOp's no-jeopardy conclusion is arbitrary

6   -  OPINION AND ORDER

and capricious because the BiOp fails to comply with the consultation requirements of

Section 7 of the Endangered Species Act (ESA), 16 U.S.C. § 1536(a)(2).  Plaintiffs

assert three claims under the citizen suit provisions of the ESA, 16 U.S.C. § 1540(g),

and the Administrative Procedure Act (APA), 5 U.S.C. § 702:

(1)  all of the federal water projects on the Snake and Columbia Rivers are

operated as a single, coordinated system, and therefore NOAA and BOR improperly

segmented the BOR's upper Snake River water projects from the Army Corps of

Engineers' (Corps) and BOR's down-river dam operations, resulting in two inadequate

biological opinions instead of one comprehensive opinion;

(2)  the analytical framework NOAA used to justify its no jeopardy opinion is

fatally flawed; and

(3)  as a result, BOR is now unlawfully taking listed salmon under Section 9 of

the ESA.

## SUMMARY JUDGMENT MOTIONS

Plaintiffs, federal defendants, and defendant-intervenor Idaho have filed cross-

motions for partial summary judgment on the segmentation and jeopardy framework

claims.

Defendant-intervenors Water Users move for summary judgment on the grounds

that plaintiffs lack standing and plaintiffs allege claims that are barred by the doctrines of

res judicata,[4] the statute of limitations, and laches.

---

[4] I have previously stricken Water Users' res judicata defense.  See Opin. and
Order, issued February 27, 2006.  Water Users raise the issue in their summary
judgment motion solely for the purpose of preserving the defense if they appeal my
rulings in this case.

Amicus Nez Perce Tribe urges the court to take into account the existence of the Snake River Basin Adjudication (SRBA) in deciding the segmentation issue.

Amicus Pacific Legal Foundation (PLF) argues that NOAA's use of a reference operation and a comparative "net effects" analysis in the 2005upperSnakeBiOp is consistent with the consultation requirements of section 7 of the ESA.  In addition, PLF argues that recovery of the species need not be addressed in a jeopardy analysis.  By implication, PLF argues that my previous rulings to the contrary regarding similar issues in the Federal Columbia River Power System 2004 Biological Opinion (FCRPS 2004BiOp) are wrong.

## SUMMARY JUDGMENT STANDARDS OF REVIEW

Action agency consultations and the resulting issuance of biological opinions constitute final agency actions under 16 U.S.C. § 1536 and are subject to judicial review.  Because the ESA has no specific provision for judicial review of final agency actions, the scope of review is governed by the Administrative Procedures Act (APA), 5 U.S.C. § 701 *et seq.*

Under the APA, an agency action must be upheld unless it is found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A); Friends of the Earth v. Hintz, 800 F.2d 822, 830-31 (9th Cir.1986). To decide if an agency action is arbitrary and capricious, the court must determine whether the agency considered the relevant factors and articulated a rational connection between the facts found and the choices made.  Pacific Coast Federation of Fishermen's Ass'n, Inc. v. Nat'l Marine Fisheries Serv. (PCFFA v. NMFS), 265 F.3d 1028, 1034 (9th Cir. 2001).  As long as the agency decision was based on the relevant

8   -  OPINION AND ORDER

factors and there is no clear error of judgment, the reviewing court may not overturn the agency's action as arbitrary and capricious.  Marsh v. Oregon Natural Resources Council, 490 U.S. 360, 378 (1989).  See also Arizona v. Thomas, 824 F.2d 745, 748 (9th Cir. 1987).

Judicial review under this standard is to be "searching and careful," but remains "narrow," and a court should not substitute its judgment for that of the agency.  Mt. Graham Red Squirrel v. Espy, 986 F.2d 1568, 1571 (9th Cir. 1993).  An agency action should be overturned only when the agency has "relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise."  Motor Vehicle Mfrs. Ass'n v. State Farm Mutual Auto. Ins. Co., 463 U.S. 29, 43 (1983).  "Deference to an agency's technical expertise and experience is particularly warranted with respect to questions involving .  .  .  scientific matter."  United States v. Alpine Land and Reservoir Co., 887 F.2d 207, 213 (9th Cir. 1989), cert. denied, 498 U.S. 817 (1990).  Nevertheless, the "presumption of agency expertise may be rebutted if the decisions, even though based on scientific expertise, are not reasoned."  Greenpeace v. Nat'l Marine Fisheries Serv., 80 F.Supp.2d 1137, 1147 (W.D. Wash. 2000).

Generally, an agency's interpretation of an ambiguous regulation is entitled to deference.  Wards Cove Packing Corp. v. Nat'l Marine Fisheries Serv., 307 F.3d 1214, 1219 (9th Cir. 2002) (citing Christensen v. Harris County, 529 U.S. 576, 588 (2000)).  When an agency's interpretation of a regulation conflicts with the agency's earlier

interpretation, however, its new interpretation is "entitled to considerably less deference" than a consistently-held agency view.  Immigration and Naturalization Service v. Cardoza-Fonseca, 480 U.S. 421, 446 n.30 (1987), citing Watt v. Alaska, 451 U.S. 259, 273, (1981).  In such a case, "[t]he agency will be required to show not only that its new policy is reasonable, but also to provide a reasonable rationale supporting its departure from prior practice."  Seldovia Native Ass'n, Inc. v. Lujan, 904 F.2d 1335, 1345 (9th Cir. 1990).  "Although the consistency of an agency's interpretation is one relevant factor in judging its reasonableness, an agency's interpretation . . . is nevertheless entitled to deference, so long as the agency acknowledges and explains the departure from its prior views."  Id.

## ENDANGERED SPECIES ACT

Congress enacted the ESA "to provide a means whereby the ecosystems upon which endangered species and threatened species depend may be conserved, to provide a program for the conservation of such endangered species and threatened species . . . ." 16 U.S.C.§ 1531(b).  The ESA requires all federal agencies to "seek to conserve endangered species and threatened species and shall utilize their authorities in furtherance of the purposes of this chapter." 16 U.S.C. § 1531(c).  In Tennessee Valley Authority v. Hill, the Supreme Court stated "[l]est there be any ambiguity as to the meaning of this statutory directive, the Act specifically defined 'conserve' as meaning 'to use and the use of all methods and procedures which are necessary to bring any endangered species or threatened species to the point at which the measures provided pursuant to this chapter are no longer necessary.'" 437 U.S. 153, 180 (1978).  "The plain

intent of Congress in enacting [the ESA] was to halt and reverse the trend towards species extinction, whatever the cost." Id. at 184. The Court emphasized that "the legislative history undergirding § 7 reveals an explicit congressional decision to require agencies to afford first priority to the declared national policy of saving endangered species." Id. at 185.

Under section 7 of the ESA, each federal agency "shall, in consultation with and with the assistance of the Secretary, insure that any action authorized, funded, or carried out by such agency (hereinafter in this section referred to as an 'agency action') is not likely to jeopardize the continued existence of the endangered or threatened species or result in the destruction or adverse modification of habitat of such species." 16 U.S.C. § 1536(a)(2).  During a section 7 consultation, the consulting agency must "[e]valuate the effects of the action and cumulative effects on the listed species or critical habitat," and determine "whether the action, taken together with cumulative effects, is likely to jeopardize the continued existence of listed species or result in the destruction or adverse modification of critical habitat." 50 C.F.R. § 402.14(g)(3). "Effects of the action" are "the direct and indirect effects of an action on the species or critical habitat, together with the effects of other activities that are interrelated or interdependent with that action, that will be added to the environmental baseline." 50 C.F.R. § 402.02.  The environmental baseline "includes all past and present impacts [on listed species and their critical habitat] of all Federal, State, private, and other human activities in the action area, the anticipated impacts of all proposed Federal projects in the action area that have already undergone formal or early section 7 consultation, and

the impact of State or private actions which are contemporaneous with the consultation in process." Id

## PLAINTIFFS', FEDERAL DEFENDANTS', AND IDAHO'S

## MOTIONS FOR SUMMARY JUDGMENT

## 1.    2005upperSnakeBiOp Jeopardy Analysis Framework

Plaintiffs seek a ruling that the 2005upperSnakeBiOp's jeopardy conclusion is invalid because it is based on the same flawed comparative analysis that federal defendants used in the 2004 FCRPS BiOp.

Federal defendants urge that I defer ruling on the validity of the jeopardy analysis in the 2005upperSnakeBiOp pending the Ninth Circuit's determination of federal defendants' appeal of my ruling on the 2004 FCRPS BiOp.  I decline to do so.  The issue has been fully briefed and is ready for decision.

On the merits, federal defendants and Idaho argue NOAA used a different jeopardy analysis because, unlike the 2004 FCRPS BiOp, the 2005upperSnakeBiOp includes impacts of both discretionary and non-discretionary agency activities in the environmental baseline.[5]

Whether NOAA included non-discretionary impacts in its jeopardy analysis does not alter the fact that the comparative approach NOAA used for determining jeopardy in both the 2004 FCRPS BiOp and the 2005upperSnakeBiOp violates the ESA.  See Nat'l

---

[5]NOAA's 2005upperSnakeBiOp was issued before I issued my ruling invalidating the 2004 FCRPS BiOp.

Wildlife Fed'n v. Nat'l Marine Fisheries Serv., CV 01-640-RE, 2005 WL 1278878 (May 26, 2005). NOAA's comparison of the effects of the action to the environmental baseline (reference operation), rather than aggregating those effects, results in a jeopardy analysis that is "insufficiently comprehensive to 'insure' that any action carried out by a federal agency is 'not likely to jeopardize the continued existence' of a listed species." Id. at *14 (citing 16 U.S.C. § 1536(a)(2)). Federal defendants' decision to segment the upper Snake River operations from the FCRPS operations crystalizes the need for a comprehensive approach to the jeopardy analysis. If NOAA segments the Columbia and Snake River Basin into two separate actions (or several actions, as NOAA claims it has the authority to do) and uses a comparative analysis, the agencies effectively preclude any jeopardy conclusion, as each agency will be able to conclude that its action is not jeopardizing listed species when compared to the environmental baseline, which of course includes the operations of the other agency and vice versa. In essence, each agency ends up pointing their finger at the other, while ignoring the needs of listed Columbia and Snake River salmon and steelhead.

As was the case in the 2004 FCRPS BiOp, NOAA's jeopardy analysis in the 2005upperSnakeBiOp did not consider the combined effects of the proposed action and the existing environmental baseline, and thus did not provide the comprehensive review that was required under the ESA. The 2005upperSnakeBiOp's jeopardy analysis is therefore invalid, and plaintiffs are entitled to summary judgment on this claim.

**2.**    **Segmentation.**

Plaintiffs assert NOAA's segmentation of the consultation for the upper Snake River water projects from the down-river dam operations precludes the kind of comprehensive jeopardy analysis required by the ESA.  The issues are (1) whether the upper Snake River water projects and the lower Snake and Columbia River dam operations are part of a single agency action, which would require NOAA, the Corps, BPA, and BOR to consult on, prepare, and implement actions the potential mitigation actions required by a single, coordinated BiOp for the entire river system; (2)  if not, are the upper Snake River projects and the lower Snake and Columbia dam operations interdependent or interrelated, such that the Action Agencies must consider  the downstream dam operations in a single BiOp together with the effects of the upper Snake River action; and (3) if not, did NOAA and BOR in any event abuse their discretion by not combining the consultations on the upper Snake River projects and the downstream dam operations.

The first two issues address the procedural requirements of the law.  The last issue addresses the substantive requirement that a consultation must comprehensively evaluate the effects of agency action(s) in order to allow for a meaningful jeopardy analysis.

### a.  BOR's Upper Snake River Water Projects and the Lower Snake and Columbia River Dam Operations Are Not a Single Agency Action.

Plaintiffs assert there should have been one biological opinion covering the proposed operations of both BOR's upper Snake River water projects and the Corps' and BOR's down-river dams because they are a single agency action.  Federal

defendants argue that the upper Snake River water projects and down-river dam operations are separate agency actions and that, procedurally, neither the ESA nor any agency regulation require them to issue a single biological opinion on the two actions.

The ESA's regulations, of course, do not explicitly define the scope of an "agency action." "Action" is simply defined as "all activities or programs of any kind authorized, funded, or carried out, in whole or in part, by the Federal agencies in the United States or upon the high seas." 50 C.F.R. § 402.02. The ESA regulations also provide federal agencies with some discretion in defining the scope of section 7 consultation, providing that an agency "may encompass . . . a number of similar individual actions within a given geographical area or a segment of a comprehensive plan" in any request for consultation. 50 C.F.R. § 402.14(c)(6). The ESA Regulations and the cases interpreting the ESA make clear, however, that an agency must consider the effects of the action as a whole. Id. The ESA requires a comprehensive jeopardy analysis, which cannot be achieved if the entire agency action is not analyzed. See Conner v. Burford, 836 F.2d 1521, 1534 (9th Cir. 1988) (In consulting on the effect of oil and gas leases on endangered species, the Fish and Wildlife Service must consider all phases of the agency action–including post-leasing activities as well as the lease sale itself–in one biological opinion); Greenpeace v. NMFS, 80 F. Supp. 2d at 1144–45 (Multiple fishery management plans governing the Gulf of Alaska and the Bering Sea/Aleutian Islands region constituted an on-going agency action requiring a single comprehensive biological opinion). Thus, an agency may not "engage in a series of limited consultations without ever taking a comprehensive assessment of the impacts of

their overall activity on protected species." <u>Am. Rivers v. U.S. Army Corps of</u> <u>Engineers</u>, 271 F. Supp. 2d 230, 255 (D. D.C. 2003) (rejecting an agency's biological opinion that confined the scope of its analysis to the consideration of one year of a multi-year plan); <u>PCFFA v. NMFS</u>, 265 F.3d at 1036–37 ("Unless the effects of individual projects are aggregated to ensure that their cumulative effects are perceived and measured in future ESA consultations, it is difficult to have any confidence in a wide regional no-jeopardy opinion.").

None of these cases, however, are directly on point as to whether the upper Snake water projects and down-river dams are part of a single agency action, as claimed  by plaintiffs.  To support their argument that there is only one action, plaintiffs rely on an informal federal publication, in the form of an internet brochure, that touts the "Federal Columbia River Power System" as a "unique collaboration among three U.S. government agencies" that comprises all 31 of the publicly-owned dams in the region. Plaintiffs also point to NOAA's draft 2000 FCRPS BiOp, which contemplated including all upper and lower Snake and Columbia River federal projects in one biological opinion, as evidence that the federal agencies have previously considered all federal projects in the Basin one coordinated action.

Plaintiffs also argue the Bonneville Power Administration (BPA) markets the power generated by the dams in the system, and that BPA, the Corps, and BOR are all signatories to the Pacific Northwest Coordination Agreement, which contemplates the coordination all of the hydropower facilities on the Columbia and Snake Rivers. According to plaintiffs, the Northwest Power Act also requires the action agencies to

engage in "coordinated and integrated planning and management for the

Columbia/Snake basin." 16 U.S.C. § 839(6). In carrying out the multiple purposes of

federal projects in the Basin, the action agencies are required "to protect, mitigate, and

enhance the fish and wildlife, including related spawning grounds and habitat, of the

Columbia River and its tributaries . . . ." 16 U.S.C. § 839(6). Moreover, Plaintiffs argue,

BOR's upper Snake River projects directly and indirectly affect the downstream dam

operations. Indeed, the 2000 FCRPS BiOp, 2004 FCRPS BiOp, and the

2005upperSnakeBiOp acknowledged that the upper Snake River water projects affect

the quality, quantity, and timing of water flowing into the lower Snake and Columbia

Rivers. BOR AR 4887.

Federal defendants point out, however, that neither the Corps nor BPA has any

authority to direct the timing or quantity of water releases from BOR's up-river projects

to aid down-river dam operations. In addition, the primary purpose of the down-river

dams is to produce and market hydroelectric power, whereas the dams on the upper

Snake River are "hydro-independents" that produce limited amounts of hydroelectric

power–if any at all–primarily to operate BOR's upper Snake River projects, and to

alleviate power emergencies. Only if the upper Snake River projects generate surplus

electricity is BPA authorized to market power produced by those dams. Unlike the

down-river dams, the dams and associated water projects on the upper Snake River

operate primarily to store water for irrigation purposes and for flood control.

In addition, the Action Agencies have historically undertaken separate ESA

consultations on the upper Snake water projects and down-river dams. Although

NOAA did in fact issue a draft biological opinion addressing <u>both</u> the upper Snake water projects and the down-river FCRPS dams in 2000, the agency segmented the upper Snake river projects from the down-river FCRPS operations before issuing the final 2000 FCRPS BiOp.  The Action Agencies segmented the upper Snake River projects from the down-river dams to facilitate the Snake River Basin Adjudication (SRBA), an agreement between Idaho, the Nez Perce Tribe, and water users regarding water rights in the upper Snake River Basin.  Accordingly, there has never been a single biological opinion covering both the down-river dams and the upper Snake River water projects.

On this record, I find that the down-river dams and the upper Snake River water projects do not comprise a single agency action for purposes of ESA consultation. Federal defendants' draft 2000 FCRPS BiOp and their online brochure, published without any formal rulemaking process, do not evidence a previous, consistently-held agency position that all federal projects in the river are a single coordinated federal action.  Although the upper Snake River projects clearly affect downstream operations, that fact itself does not mean that BOR's operations in the upper Snake River are the same as, or indistinguishable from, the Corps' operation of the down-river projects. Some of BOR's projects generate hydroelectric power, which is marketed by BPA, but the projects operated by BOR and the Corps each serve fundamentally different purposes.  Although the Action Agencies clearly have the discretion to consider all federal actions in the river together, there is simply not enough evidence to suggest that those agencies must, and actually do, operate every federal project in the Basin as part of the same action.

**b. BOR's Upper Snake River Water Projects and the FCRPS Dams Are Not Interrelated or Interdependent Actions.**

The upper Snake water projects and down-river dams are not part of the same agency action.  However, if the two actions are "interrelated or interdependent," the effects of both proposed actions must be combined in the "effects of the action" of any biological opinion issued for either the upper Snake water projects or the down-river dams.  The ESA regulations provide:

> "Effects of the action" refers to the direct and indirect effects of an action on the species or critical habitat, <u>together with the effects of other activities that are interrelated or interdependent</u> with that action, that will be added to the environmental baseline.  .  .  .
>
> <u>Interrelated actions are those that are part of a larger action and depend on the larger action for their justification. Interdependent actions are those that have no independent utility apart from the action under consideration</u>.

50 C.F.R. § 402.02 (emphasis added).

The upper Snake water projects and down-river dams each have independent utility - the former primarily operate to provide irrigation and flood control, and the latter primarily operate to provide hydroelectric power for sale in the region and elsewhere. The actions, therefore, are not interdependent.

In determining whether the two actions are interrelated, each depending on the other for its justification, I am required to use a "but for" analysis,"  i.e., would the activities in the one action not occur without the existence of–or "but for"–the other action.  <u>Sierra Club v. Marsh</u>, 816 F.2d 1376, 1387 (9th Cir. 1987); <u>Bennett v. Spear</u>, 5

F. Supp. 2d 882, 886 (D. Or. 1998) (Hogan, C.J.).[6]  It is clear that the irrigation and

flood control activities of the upper Snake River water projects would occur regardless

of the hydroelectric power generation of the down-river dams, and vice versa.  The

analysis is not clear as to the 487 kaf of salmon flow augmentation.  A persuasive

argument can be made that BOR's proposed flow augmentation would <u>not</u> occur without

the existence of the down-river FCRPS dams.  Indeed, the flow augmentation is

specifically designed to mitigate the deleterious effects of the FCPRS dams on

migrating juvenile salmon.  There appears to be no other reason to release that water.[7]

However, the primary federal action at issue here is the proposed operation of BOR's

_____

[6]Although I am not entirely persuaded that the "but for" test is the correct
approach to determining whether actions are "interrelated," I am obligated to follow the
Ninth Circuit opinion in <u>Sierra Club v. Marsh</u>, which established the "but for" test as the
rule for determining interrelatedness. 816 F.2d 1376, 1387 (9th Cir. 1987).  The
regulatory definition for interrelated actions–"those that are part of the larger action and
depend on the larger action for their justification"–seems contrary to the common
understanding of the term: "to have mutual relationship." <u>Webster's</u> <u>Third</u> <u>New</u>
<u>International</u> <u>Dictionary</u> 1182 (1981).  Under the broader, common definition, the upper
Snake River projects and the down-river dam operations would seem to be interrelated
because there is in fact a mutual relationship between the two actions.  In addition,
because the ESA regulations separately define the terms "interrelated" and
"interdependent," and separate the terms with the word "or," the rules of statutory
construction would ordinarily suggest that the terms were meant to have separate and
distinct meanings.  Thus, using the same "but for" test to analyze both
"interrelatedness" and "interdependence" seems somewhat problematic. In any event, I
cannot say that the federal defendants abused their discretion by following their own
"but for" analysis, which has apparently been endorsed by the Ninth Circuit Court of
Appeals.

[7]It appears that the 487 kaf of salmon flow augmentation is actually a reasonable
and prudent alternative (RPA), which NOAA and BOR have characterized as part of the
proposed action in order to avoid a jeopardy conclusion.  Conveniently for the agencies,
by characterizing the flow augmentation as part of the proposed action rather than an
RPA, the agencies are relieved of the burden of ensuring that it is reasonably certain to
occur.  <u>See</u> <u>Sierra Club v. Marsh</u>, 816 F.2d at 1380 ("Mitigation measures must be
reasonably specific, certain to occur, and capable of implementation . . . .").

upper Snake River water projects, and BOR's operation of the upper Snake River water projects is not interdependent or interrelated to the Corps operation of the FCRPS dams.

Therefore, under the ESA regulations, the effects of down-river dam operations are not required to be combined with the effects of the proposed action for the upper Snake water projects in a single biological opinion.

**c. The Action Agencies' Segmentation of Section 7 Consultation for the Upper Snake River Water Projects from the FCRPS Was Not an Abuse of the Agencies' Discretion.**

Federal defendants agree they have discretion to combine the upper Snake River water projects and down-river dam operations in a single biological opinion, but have chosen not to do so.  Consistent with the above discussion, they argue that "[n]othing in the text of the ESA or its implementing regulations require action agencies to define their proposed agency actions in any particular manner that will best serve biological needs." Reply Brief for Fed. Defs., at 12 (Apr. 14, 2006).

In fact, NOAA, BOR, and the Corps chose not to put the biological needs of endangered salmon first when they first decided in 2000, and again in 2005,  to consult separately on the upper Snake River water projects and the down-river dam operations. The agencies' decision was not made to benefit endangered salmon, but rather to preserve and secure—for the next thirty years—the rights of various water users for irrigation water, which could have been used to augment flow to benefit salmon runs. Those rights were negotiated as part of the Snake River Basin Adjudication (SRBA).  A

specific condition of the agreement requires section 7 consultation on the upper Snake

River water projects to be separate from the consultation on the down-river dam

operations.  Not coincidentally, like the SRBA, the 2005 upper Snake BiOp has a term of

30 years.  In 2004, Congress authorized the SRBA.[8]  Federal defendants now assert

that the congressional authorization of the SRBA "provide[s] a compelling reason for the

agencies to prepare a separate BiOp for the Upper Snake."  Reply Brief for Fed. Defs.,

at 26. The SRBA, however, does not override the requirements of the ESA.[9]

I agree with federal defendants that they have discretion in defining the action on

which to consult.  Plainly, they could exercise that discretion by choosing to combine

similar actions in one consultation.  50 C.F.R. § 402.14(c)(6) (The consultation "may

encompass, subject to the approval of [NOAA], a number of similar individual actions

within a given geographical area.").  The issue here is whether federal defendants

abused that discretion and acted arbitrarily and capriciously in this case by not doing so.

Similar regulations promulgated under the National Environmental Policy Act,

42 U.S.C. § 4321 *et seq*, (NEPA), offer useful guidance in the present case.  Like the

ESA, NEPA requires the effects of "interrelated" or "interdependent" activities to be

considered in an environmental impact statement.  50 C.F.R. § 1508.25.  NEPA,

however, also includes a provision regarding "similar actions" that are not interrelated or

---

[8] Snake River Water Rights Act of 2004 (SRWA), Pub. L. No. 108-447, 2004
USCA (118 Stat. 2809, 3433-3441).

[9] Section 11(b)(1) of the SRWA provides that nothing in this Act "preempts, or
supercedes" any . . . Federal Law."

22  -  OPINION AND ORDER

interdependent:

> Similar actions, which when viewed with other reasonably foreseeable or proposed agency actions, have similarities that provide a basis for evaluating their environmental consequences together, such as common timing or geography. <u>An agency may wish to analyze these actions in the same impact statement. It should do so when the best way to assess adequately the combined impacts of similar actions or reasonable alternatives to such actions is to treat them in a single impact statement.</u>

<u>Id</u>. (Emphasis added).

The additional language pertaining to "similar actions" in the NEPA regulation plainly recognizes the need for a comprehensive analysis of the environmental impacts of major federal activities, whether or not the activities are encompassed in a single action or multiple actions, or are interrelated or interdependent. The regulation explicitly states what is assumed in the ESA regulations and what is required under the ESA—a comprehensive jeopardy analysis that takes into consideration all relevant adverse effects of agency actions. See <u>Am. Rivers v. U.S. Army Corps of Engineers</u>, 271 F. Supp. 2d at 255; <u>Greenpeace v. NMFS</u>, 80 F. Supp. 2d at 1144-45.

The critical issue is whether such a comprehensive analysis can be achieved in two separate biological opinions. Federal defendants argue that if the comparative jeopardy framework is rejected, a comprehensive analysis using an aggregate jeopardy framework can be achieved in two biological opinions. I agree. But in order to produce a valid biological opinion, NOAA must examine whether the effects of the proposed action, together with any cumulative effects, will jeopardize the continued existence of the listed species when <u>added</u> to the environmental baseline. NOAA may include the FCRPS in the environmental baseline of BOR's proposed action in the upper Snake

River, or vice versa.  However, only if NOAA examines the effects of a federal action on
the listed species and any cumulative effects and the environmental baseline <u>in the
aggregate</u>, can the agency insure that a proposed action will not jeopardize the
continued existence of the listed species.  Regardless of whether the effects of the
FCRPS and the upper Snake River water projects are analyzed in one or two biological
opinions, the result must comply with Justice Burger's admonition; the Action Agencies
first priority must be to "halt and reverse the trend toward species extinction, whatever
the cost."  <u>TVA v. Hill</u>, 437 U.S. at 184-85.

In the past, NOAA, BOR, the Corps, and BPA have failed to demonstrate a
willingness to put the needs of salmon first, or to commit the resources necessary to
implement mitigation measures.  The 2000 FCRPS BiOp found the continued existence
of salmon was jeopardized by the down-river dam operations and recognized the need
for both a change in direction and the commitment of substantial resources to avoid
jeopardy.  It became apparent, however, during the 2000 FCRPS BiOp remand that the
action agencies were not willing to commit the resources necessary to implement the
mitigation actions required by the 2000 FCRPS BiOp.  Rather than ensuring that those
mitigation measures were certain to occur, the federal defendants scrapped the
analytical framework in the 2000 FCRPS BiOp and adopted a fatally flawed comparative
jeopardy analysis in the 2004 FCRPS  BiOp.  In so doing, it became apparent that the
Action Agencies priorities did not include the survival and recovery of threatened and
endangered Columbia Basin salmon.  Instead, their goal was to avoid a jeopardy
conclusion, and the difficult policy choices and resource commitments that accompany

such a conclusion.  Accordingly, by procedural device, the agencies issued a biological opinion premised on a analytical framework that was designed to avoid a jeopardy conclusion.

For these reasons, the remand of the 2005upperSnakeBiOp will be joined with the remand of the 2004BiOp.  A combined consultation will be more likely to achieve the comprehensive analysis required by the ESA, but the decision to produce one biological opinion or two ultimately lies with the action agencies.  I do not find an abuse of discretion in the segmentation of consultation for the upper Snake project.  I would have found otherwise but for the "but for" test in <u>Marsh v. Oregon Natural Resources Council</u>, 490 U.S. 360, 378 (1989).

I look forward to a consultation that employs a valid, comprehensive analytical framework.  Rebuilding salmon to healthy, harvestable levels will come in large part from addressing the impacts of the down-river dam operations that do the most harm to salmon.  Even so, the water of the upper Snake water projects and its uses must be an integral part of the analysis.  There must be a comprehensive evaluation of the effects of water use in the upper Snake River and the down-river dam operations.

**3.    Summary.**

I conclude that the 2005upperSnakeBiOp is arbitrary and capricious, and invalid under the ESA because it relies on the same flawed comparative jeopardy analysis used in the 2004BiOp for the down-river dams. The 2005upperSnakeBiOp will be remanded with further instructions to NOAA and BOR to correct its flaws.

I conclude that NOAA and BOR may continue to segment the upper Snake water

projects from the down-river FCRPS operations in the upcoming consultations during the remand period for both biological opinions.

## WATER USERS' MOTIONS TO STRIKE

Water Users move (1) to strike the declarations of Glenn Spain, William Sedivy, and Cheryl Barton, filed in support of plaintiffs' motion for partial summary judgment and reply brief, and (2)  to strike "immaterial and impertinent allegations" in plaintiffs' Amended First Supplemental Complaint, and facts set forth in plaintiffs' Statement of Material Facts filed in support of their motion for partial summary judgment, and (3) to strike plaintiffs' response to Water Users' motion for summary judgment, as well as extra-record materials attached to plaintiffs' responses to both defendants' and intervenor-defendants' cross-motions for summary judgment.

## 1.    Spain, Sedivy and Barton Declarations.

Spain, Sedivy, and Barton are directors, officers, and/or members of plaintiffs' organizations.  They have submitted declarations solely for the purpose of establishing plaintiffs' standing to sue.  In their declarations, they identify their interests and involvement in those organizations, their specific interests in the survival and recovery of listed salmon in the Columbia River Basin, including the Snake River, and their opinions regarding the species' decline and what needs to be done to reverse the situation.

Water Users move to strike the opinions on the ground that the declarants are not qualified as experts to offer them.

To establish standing to challenge agency action in a case such as this, a declarant must demonstrate that he has "reasonable concerns about the effects of . . . [the agency action on his] recreational, aesthetic, and economic interests." Friends of the Earth v. Laidlaw, 528 U.S. 167, 181, 183–84 (2000).  Courts "assume the truth of the evidence proffered by plaintiffs" solely for the purpose of establishing standing. Bonnichsen v. U.S. Dep't of Army, 969 F. Supp. 628, 632 (D. Or. 1997).  "The issue of standing should not be confused with the merits of the underlying action."  Id., at 637, n.5.

For purposes of establishing standing, these declarants do not need to prove they qualify as experts regarding the state of salmon in the Columbia River Basin. Accordingly, I deny Water Users' motion to strike the Sedivy, Spain, and Barton declarations.

**2.    Immaterial and Impertinent Allegations - Extra Record Materials.**

Water Users move pursuant to Fed. R. Civ. P. 12(f) to strike allegations in plaintiffs' amended supplemental complaint and fact statements in plaintiffs' motion for partial summary judgment because they are based on extra-record materials that may not be considered on judicial review of agency action under the Administrative Procedure Act.

The predicate for this part of Water Users' motion to strike is my recent order in this case striking Water Users' res judicata affirmative defense.  By asserting that defense, Water Users' sought to bar any claim by plaintiffs regarding the adequacy of

"flow targets" or "flow augmentation requirements" in the 2005upperSnakeBiOp.  They

argued that an earlier opinion issued in 1997 addressing specific flow targets and flow

augmentation issues arising from a different biological opinion had preclusive effect as a

matter of law in this case.  I struck the defense on the ground that there was no "identity

of claims" between different biological opinions having separate administrative records,

addressing different proposed actions, and spanning different periods of time.

See Opin. and Order, issued Feb. 27, 2006, at 2-3.

Water Users now contend that my order striking the res judicata defense

"mandate[s] that claims and issues flowing from biological opinions and adjudications

regarding the same have no legal bearing on or factual connection to this case."  Water

Users are wrong.

First, under Rule 12(f), a motion to strike should be made "before responding to a

pleading."  Water Users has already responded to plaintiff's complaint.  This motion,

therefore, is untimely as to allegations in plaintiff's amended supplemental complaint.

Second, Water Users erroneously equate my ruling on Water Users'  res judicata

affirmative defense to the applicable scope of review under the APA.  I held only that a

prior ruling on claims in one biological opinion does not bar the assertion of claims

arising from a subsequent biological opinion because the requisite "identity of claims"

is lacking.  That concept is not related to the statutory scope of review under the

 APA.

Water Users are correct that the court's review on summary judgment

28  -  OPINION AND ORDER

should focus on the administrative record in existence when NOAA issued the 2005upperSnakeBiOp. There are, however, exceptions to that general rule.  The court may consider extra-record materials if they meet any one of the following criteria: (1) they are necessary to determine if the agency considered all relevant factors and explained its decision; (2) the agency relied on documents not in the record; (3) they are necessary to explain technical or complex subject matter; or (4) to make a showing of agency bad faith.  Southwest Center for Biological Diversity v. United States Forest Service, 100 F.3d 1443, 1450 (9th Cir. 1996).

In this motion to strike, Water Users do not specifically identify which of plaintiffs' allegedly immaterial and impertinent allegations, if any, fall outside the above exceptions and, therefore, should be stricken.  Plaintiffs assert the extra-record materials are submitted, inter alia, to establish federal defendants failed to consider relevant factors in their jeopardy analysis.

Accordingly, I deny Water Users' motion to strike immaterial and impertinent allegations.

**3.    Plaintiff's Response Memorandum, and Extra-Record Materials.**

Water Users contend plaintiffs violated my order allowing plaintiffs an additional ten pages to respond to defendants' and defendant-intervenors' cross-motions for summary judgment.  Instead, plaintiff not only filed a memorandum in response to the cross-motions of federal defendants and defendant-intervenor Idaho that contained the additional ten pages allowed by the court, but also improperly filed an entirely separate

memorandum against Water-Users' summary judgment motion.

Water Users ignore the fact that plaintiffs specifically noted that their request for additional pages did not apply to Water Users' separate motion for summary judgment and that plaintiffs would "file a separate opposition to that separate motion."  Pl.'s Mot. to Exceed Page Limits, p. 3, n1.

Water Users' summary judgment motion raises standing, res judicata, and statute of limitations issues not raised by federal defendants or Idaho.  It was reasonable for plaintiffs to address those issues in a separate memorandum.  In any event, if Water Users objected to plaintiffs' intent to file a separate brief against their motion, they should have objected before plaintiffs filed their separate response.

Water Users also object to extra-record materials attached to plaintiffs' responses to the federal defendants' and defendant-intervenors' motions for summary judgment on the ground that my review should be based solely on documents in the Administrative Record.  Water-Users, however, again fail to identify which of the extra-record materials are objectionable.

For these reasons, I deny Water Users' motion to strike plaintiffs' response to Water Users' motion for summary judgment and the extra-record materials attached to plaintiffs' responses to both that motion and federal defendants' cross-motion.

## WATER USERS' MOTION FOR SUMMARY JUDGMENT

1.    **Standing.**

Water Users argue the Spain, Sedivy, and Barton declarations are insufficient to establish that plaintiffs have standing to bring this action.  I disagree.

Spain states he is the Regional Director of plaintiff Pacific Coast Federation of Fishermen's Associations (PCFFA) and Conservation Program Director of plaintiff Institute for Fisheries Resources (IFR).  In his representative capacity, Spain asserts, inter alia, the decline in salmon species has "harmed PCCFA members that depend upon fish coming from the Columbia and Snake Rivers by limiting commercial harvest opportunities, by forcing many boat owners out of business, and by adversely affecting the potential for future income for the remainder."  Spain Decl., ¶ 12.  He further asserts that the implementation of measures to ensure the survival and recovery of these species "would alleviate some of the harm to PCCFA members by allowing them to sustainably harvest many otherwise abundant stocks."  Id., ¶ 15.

Sedivy is a member of plaintiffs American Rivers and Idaho Rivers United (IRU).  He asserts he and his family "rely on Snake River salmon and steelhead and their habitat for recreational, fishing, conservation, and aesthetic benefits."  Sedivy Decl., ¶ 9.  He states, inter alia, he "would spend even more time on the rivers," and that "[a]s it stands, however, my recreational and aesthetic experiences on the Snake River and its tributaries are extremely diminished and harmed by the lack of salmon and steelhead."  Id., ¶ 10.  He believes "these injuries can be remedied by a court order that compels these agencies to comply with their obligations under the Endangered Species Act."  Id.,

31  -  OPINION AND ORDER

¶ 17.

Barton has been a member of the National Wildlife Federation since 2003 and is
or has been a director or officer of the Idaho Wildlife Federation and Idaho Sportmen's
Caucus Advisory Council.  Barton Decl., ¶¶ 1 and 2.  She states she is a native Idahoan
who fishes, hikes, and recreates "in and around the rivers" inhabited by Snake River
salmon.  ¶ 4.  She further states "[t]he loss of salmon and steelhead fishing affects my
quality of life and my recreational values," and that "[i]f salmon and steelhead runs
improve and recover to sustained harvestable levels, I would spend even more time on
the river fishing and simply enjoy observing these fish as they fight their way back
upstream to their spawning grounds."  ¶ 9.

Plaintiffs bring this action under both the citizen suit provisions of the ESA and
the APA.  To establish standing to assert their claims under either statute, plaintiffs must
show that (1) they have suffered an injury in fact that is (a) concrete and particularized,
and (b) actual and imminent, (2) the injury is fairly traceable to the challenged action of
the defendant, and (3) the injury is likely to be redressed by a favorable decision.  Lujan
v. Defenders of Wildlife, 504 U.S. 555, 560-61 (1992).  In addition, to have standing to
assert their APA claims, plaintiffs must demonstrate their interests fall withing the zone
of interests protected by the ESA.  Bennett v. Spear, 520 U.S. 154, 175 (1997).  No
such showing is required for plaintiffs to assert their claims under the ESA citizen suit
provisions.  Id. at 163.  For APA claims, the zone of interests protected by the ESA are
sufficiently broad to include adverse economic consequences

flowing from the enforcement of environmental restrictions.  Id. at 176-77.

The Spain, Sedivy, and Barton declarations clearly establish that they and the members of their organizations allege injury to their economic, recreational, fishing, and/or aesthetic interests that are protected by the ESA and are actionable under the citizen suit provisions of the ESA and the APA.  Plaintiffs have standing to bring this action.

**2.**     **Statute of Limitations - Laches.**

Water Users assert plaintiffs failed to assert their improper segmentation claim within six years after they knew or should have known the federal defendants had segmented their consultations on the upper Snake water projects and down-river dam operations.

Title 28, section 2401(a) provides that "every civil action commenced against the United States shall be barred unless the complaint is filed within six years after the right of action first accrues."    Accordingly, APA claims must be brought within six years of the date of the final agency action.  Trafalgar Capital Assoc. v. Cuomo, 159 F.3d 21, 54 (1st Cir. 1998); Environmental Protection Information Center v. Pacific Lumber Co., 266 F. Supp. 2d 1101, 1121 (N.D. Cal. 2003); Alsea Valley Alliance v. Evans, 161 F. Supp. 2d 1154, 1160 (D. Or. 2001).

The 2005upperSnakeBiOp became a final agency action when it was issued on

March 31, 2005.  Plaintiffs first asserted an improper segmentation claim against the

2005upperSnakeBiOp on October 26, 2005, after I granted plaintiffs leave to supplement an existing complaint that had challenged an earlier biological opinion on the same grounds.  Plaintiffs' claim was asserted within the applicable statute of limitations.

The doctrine of laches does not apply because plaintiffs diligently pursued their improper segmentation claim after the 2005upperSnakeBiOp was issued.  <u>See</u> <u>Coalition for Canyon Preservation v. Bowers</u>, 632 F.2d 774, 779 (9th Cir. 1980) (Laches applies where the plaintiff's lack of diligence in asserting a claim results in prejudice to the defendant).  Moreover, Water Users' argument that plaintiffs knew or should have known that federal defendants were allegedly violating the ESA as early as 1995, even if it had any merit, is irrelevant.  The issue is whether plaintiffs have asserted a timely claim against the 2005upperSnakeBiOp, not a previous biological opinion.

Plaintiffs' improper segmentation claim is not time-barred.

## <u>CONCLUSION</u>

For these reasons, the court **GRANTS** in part and **DENIES** in part plaintiffs' motion for partial summary judgment (doc. 177), **GRANTS** in part and **DENIES** in part the motion for summary judgment of defendant-intervenor State of Idaho (doc. 199), **DENIES** defendant-intervenors Water Users' motion for summary judgment (doc. 208), **GRANTS** in part and **DENIES** in part federal defendants' cross-motion for partial summary judgment (doc. 214), and **DENIES** defendant-intervenor Water Users' motions

34  -  OPINION AND ORDER

to strike (doc. 203, doc. 205, doc. 249, and doc. 251).

IT IS SO ORDERED

DATED this        day of May, 2006.

_____

James A. Redden
Senior United States District Judge